# 26-1201-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

RAFFIQUE KHAN,

Plaintiff-Appellant,

- against -

NEW YORK CITY, NYPD OFFICER MATTHEW S. BESSEN, NYPD OFFICER
NOAH NICHOLSON, NYPD SGT. PATRICK HUGHES, NYPD OFFICER
JOSEPH JACOBSEN, NYPD OFFICER THOMAS COSTIGAN, NYPD OFFICER
JEISON JARA, NYPD OFFICER MOHAMED ELDIASTY, and NYPD OFFICER
JOSEPH ASTARITA

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK (HON. BRIAN M. COGAN)

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

JONATHAN I. EDELSTEIN
EDELSTEIN & GROSSMAN
Attorney for Plaintiff-Appellant
501 Fifth Avenue, Suite 514
New York, NY 10017
(212) 871-0571
jonathan.edelstein.2@gmail.com

# **TABLE OF CONTENTS**

Table of Authorities…. ..................................................................................... iii

Preliminary Statement...................................................................................1

Statement of Facts……................................................................................2

Summary of the Argument...........................................................................11

Summary Judgment Standard ......................................................................13

Argument…………… ...............................................................................14

POINT I

TRIABLE ISSUES EXIST CONCERNING WHETHER
PROBABLE CAUSE EXISTED TO ARREST KHAN FOR
ANY OFFENSE AND WHETHER THE ARRESTING
OFFICERS ARE PROTECTED BY QUALIFIED IMMUNITY ...............14

    A.    Probable Cause Standard .........................................................16

    B.    Probable Cause Did Not Exist for Failure to Safely
        Store a Firearm.......................................................................17

    C.    Probable Cause Did Not Exist for Attempted
        Possession of a Firearm in a Sensitive Location ......................21

    D.    Triable Issues Exist Concerning Qualified
        Immunity................................................................................24

POINT II

KHAN'S SECOND AMENDMENT CLAIM SHOULD NOT
HAVE BEEN DISMISSED.........................................................................28

i

POINT III

SUMMARY JUDGMENT SHOULD NOT HAVE BEEN
GRANTED ON KHAN'S <u>MONELL</u> CLAIMS ...........................................33

Conclusion…………. ..................................................................................38

Certificate of Compliance ..........................................................................39

Special Appendix
-
Memorandum Decision and Order Appealed From .............................. SPA-1

Judgment Appealed From ....................................................................... SPA-9

## TABLE OF AUTHORITIES

**Cases:**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..............................13

Antonyuk v. James, 120 F.4th 941 (2d Cir. 2024)..............................29

Ashcroft v. al-Kidd, 563 U.S. 730 (2011) ..............................25

Askins v. Doe No. 1, 737 F.3d 248 (2d Cir. 2013)..............................33

Bailey v. City of New York, 79 F. Supp. 3d 424 (E.D.N.Y. 2015)..............................25

Brewer v. Vanmarter, 2024 WL 2131521 (W.D. Va. 2024) ..............................32

Brogdon v. City of New Rochelle, 200 F. Supp. 2d 411 (S.D.N.Y. 2002) ..............................35

Bryan County v. Brown, 520 U.S. 397 (1997) ..............................37,38

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..............................13,14

Chimel v. California, 395 U.S. 752 (1969)..............................19n

Chunn v. Amtrak, 916 F.3d 204 (2d Cir. 2019)..............................13

District of Columbia v. Heller, 554 U.S. 570 (2008) ..............................28,29

Felmine v. City of New York, 2011 WL 4543268 (E.D.N.Y. 2011)..............................25,27

Florida v. J.L., 529 U.S. 266 (2000) ..............................17,20,27

Garcia v. Bloomberg, 662 Fed. App'x 50 (2d Cir. 2016)..............................34

Gould v. Winstar Communications, Inc., 692 F.3d 148 (2d Cir. 2012) ..............................14

Gugino v. City of Buffalo, 2022 WL 5240162 (W.D.N.Y. 2022) ..............................33

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ..............................24

Hollins v. City of New York, 2014 WL 836950 (S.D.N.Y. 2014)...........................34

Illinois v. Gates, 462 U.S. 213 (1983) ...............................................................16,17

Jocks v. Tavernier, 316 F.3d 128 (2d Cir. 2003)...............................................16

Jones v. Treubig, 963 F.2d 214 (2d Cir. 2020)...................................................26

Kuehl v. Burtis, 173 F.3d 646 (8th Cir. 1999)....................................................16

Lynch v. Town of Amherst, 2026 WL 479050 (W.D.N.Y. 2026) ........................37

Marinis v. Village of Irvington, 212 F. Supp. 2d 220 (S.D.N.Y. 2002)..................17

McDonald v. City of Chicago, 561 U.S. 742 (2010)..........................................28

Monell v. Dep't of Social Servs., 436 U.S. 658 (1978)...................................*passim*

Nathanson v. United States, 290 U.S. 41 (1933) ...............................................16

New York Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022) ..........28,29,30,31

Nick's Garage v. Progressive Cas. Ins., 875 F.3d 107 (2d Cir. 2017) ...............13,14

O'Brien v. Nat'l Gypsum Co., 944 F.2d 69 (2d Cir. 1991)....................................14

Ocasio v. Chalker, 2007 WL 1544205 (D. Conn. 2007) ........................................27

Panetta v. Crowley, 460 F.3d 388 (2d Cir. 2006)...................................................16

Pearson v. Callahan, 555 U.S. 223 (2009)........................................................24,25

People v. Bracey, 41 N.Y.2d 296 (1977)............................................................22,23

People v. Corporan, 200 A.D.2d 155 (1st Dept. 1994) ..........................................23

People v. Hiedeman, 189 A.D.3d 1902 (3d Dept. 2020)....................................23,24

People v. Lendof-Gonzalez, 36 N.Y.3d 87 (2020)................................................23

iv

People v. Mahboubian, 74 N.Y.2d 174 (1989)........................................................22

People v. Naradzay, 11 N.Y.3d 400 (2008)..........................................................23

People v. Rizzo, 246 N.Y. 334 (1927)..................................................................23

People v. Sullivan, 173 N.Y. 122 (1903)..............................................................23

People v. Werdlow, 241 N.Y. 55 (1925) ...............................................................23

Reynolds v. Giuliani, 506 F.3d 183 (2d Cir. 2007) ..........................................35,36

Sec. Ins. Co. v. Old Dominion Freight Line, 391 F.3d 77 (2d Cir. 2004)...............14

Teller v. Fields, 280 F.3d 69 (2d Cir. 2000) ........................................................31

Thomas v. City of New York, 2018 WL 4328825 (E.D.N.Y. 2018) ......................17

Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014)...............................37

Toure v. Port Auth., 2025 WL 3674392 (E.D.N.Y. 2025) ..................................20n

United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) .................................17

Valdiviezo v. Boyer, 752 Fed. App'x 29 (2d Cir. 2017) ........................................35

Vasconcellos v. City of New York, 2016 WL 403474 (S.D.N.Y. 2016) ................35

Vitalone v. City of New York, 2018 WL 1507591 (S.D.N.Y. 2018)......................27

Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992)....................................35

Woodard v. Brown, 2009 WL 10700050 (N.D. Ga. 2009) ...................................26

Zellner v. Summerlin, 494 F.3d 344 (2d Cir. 2007) .........................................25,27

**Constitutional Provisions, Statutes and Rules:**

U.S. Const. Amend. 2 ....................................................................................*passim*

U.S. Const. Amend. 4 ........................................................................*passim*

28 U.S.C. § 1291…......................................................................................1

28 U.S.C. § 1331…......................................................................................1

42 U.S.C. § 1981…......................................................................................9

42 U.S.C. § 1983…….................................................................................*passim*

Fed. R. Civ. Pro. 56…..........................................................................13,34

NY Penal Law § 265.01 ..........................................................................14

NY Penal Law § 265.01-e............................................. 12,15,15n,16,21,22,23,24,26

NY Penal Law § 265.03 ..........................................................................14

NY Penal Law § 265.20 ..........................................................................15

NY Penal Law § 265.45..................................... 10,11,15,16,17,18,18n,26

NY Penal Law § 400.00.................................................................7,10,10n,14

NYC Admin. Code S 10-131 ...............................................................14,15

## PRELIMINARY STATEMENT

Plaintiff-Appellant RAFFIQUE KHAN, by and through the undersigned counsel, respectfully submits this brief in support of his appeal from (1) a final judgment of the United States District Court for the Eastern District of New York (Hon. Brian M. Cogan, J.) entered April 7, 2026, which granted summary judgment to the Defendants-Appellees on Khan's claims under 42 U.S.C. § 1983; and (2) the Memorandum Decision and Order of the same Court and Judge dated April 6, 2026, upon which such judgment is based. The district court had jurisdiction under 28 U.S.C. § 1331 and this Court has jurisdiction under 28 U.S.C. § 1291. Plaintiff-Appellant's appeal is as of right.

## STATEMENT OF QUESTIONS PRESENTED

1.      Do triable issues of fact exist regarding whether probable cause existed for Plaintiff-Appellant's arrest and whether the arresting officers are protected by qualified immunity?

2.      Do triable issues of fact exist concerning whether Defendants-Appellees violated Plaintiff-Appellant's Second Amendment rights independently of his arrest?

3.      Was it error to grant summary judgment on Plaintiff-Appellant's claim for municipal liability?

Plaintiff-Appellant submits that the answer to these questions is "yes."

1

**STATEMENT OF FACTS**

Plaintiff-Appellant Raffique Nishan Khan was born in Trinidad and Tobago and moved to the United States in 1993 (A219),[1] after which he graduated from high school and attended Medgar Evers College and Maryland University (A222-23).  In 2008, he joined the United States Army (A226), ultimately attaining the rank of staff sergeant (A228).  He retired in 2016 (A227) with injuries entitling him to Purple Heart license plates (A247). He remains employed by the federal government (A226) with responsibility for the food defense of New York State (A225).[2]

On November 6, 2023, Khan had two firearm permits issued by New York City: a residence permit and an unrestricted concealed carry permit. (A216, 229). Both permits are for Smith & Wesson weapons. (Id. at 49).  The concealed carry permit was issued on September 1, 2023 with an expiration date of December 19, 2026. (A216)

Prior to a 2022 rule change, a concealed carry permit was known as "carry business" because permit applicants had to show a reason, such as a business, why they needed to carry a concealed weapon. (A49, p.24). A "limited carry" license

---

[1] Citations to "A" refer to the Appendix submitted herewith, which contains all papers filed below.

[2] As stated in the complaint and not contested below, Khan also won the Bronze Star and Combat Action Badge for saving trapped personnel from an IED in Afghanistan, and is now employed by the National Park Service as an Environmental Protection Specialist, a law enforcement title.

would have hours and designations. (A49, p.25). However, a business carry license without limitations would enable the holder to carry a concealed weapon throughout New York City. (A50, p.26).

The change in nomenclature from "carry business" or "business carry" to "concealed carry" was promulgated in September 2022 as a result of a Supreme Court ruling. (A50, p.26) However, the firearms licensing database available to the NYPD was not immediately changed to reflect the updated nomenclature. (A50, p.27). Until the computer database was updated, a concealed carry license would show up as business carry. (A50, p.28). Officer Astarita of the NYPD firearms licensing division didn't know exactly when the computers were updated, although he believed the update occurred before July 31, 2024. (A51, p.32). He was not aware of any training of NYPD officers that the information in the database might be inaccurate (A294). Nor was he aware of any training of police officers regarding the meaning and scope of various forms of firearm license. (A298).

On November 25, 2023, a few of Khan's relatives came to town and stayed at his home because his mother had recently passed away and it would have been her 70th birthday. (A240). Later in the day, Khan's cousin Ryan Hooper said he had a "surprise" for Khan, and they went to the Brooklyn neighborhood where they all grew up. (A245). They went to a catering hall Khan's relatives had rented, getting there about 1:00 or 1:30 a.m. (A257), and socialized for about two hours (A248-49).

3

When Khan left his house to go to the "surprise," he carried his concealed weapon on his person. (A250). The vehicle he was driving was equipped with a gun safe which he kept underneath the rear passenger seat. (A251). It was an approved safe that Khan had obtained as part of the permitting process and was locked with a thumbprint. (A252). The safe was attached to a cable that Khan could use to move it to different parts of the car (A251), with the cable attached to the front of the car compartment (A252).

When Khan got to the catering hall, a security guard was outside. (A253). Khan asked the guard whether weapons were allowed but the guard did not respond. (A253). He stayed outside the facility and didn't enter it with a weapon. (A254). He hadn't known what kind of facility he was going to before getting there – it was a surprise. (A255). He had never been to that venue before. (A260). There were no signs saying that weapons were prohibited. (A260). However, because Khan now saw that "they did have alcohol inside of that facility" (A254), he turned around, went to his car, and secured his weapon in his own vehicle (A253-54). When he returned and entered the catering hall, the weapon was locked into the safe. (A256).

After leaving the venue with to-go trays, Khan and his relatives sat in his car for about 20 to 30 minutes catching up and talking. (A263). When he got into the car, he took the gun out of the safe and carried it on his person with a holster. (A264-65). He sat in the driver's seat with Ryan Hooper in the front passenger seat and

4

Brandon Sing, another relative, in the back seat. (A266). At about 3:20 or 3:30, he began to drive back toward his home in St. Albans, Queens. (A268). After driving a few blocks, an unmarked police vehicle approached him and put on the flashing lights. (A269).

The reason for the police approach was that defendant Sergeant Patrick Hughes "received information from a sergeant assigned to the Intelligence Division that he had information from a confidential informant" that a male had "attempted to enter an establishment with a firearm" and that, after being denied entry, "walked over to where his car was parked, opened up the car, and placed that gun inside the glove box" before "return[ing] to the establishment no longer armed with that gun." (A102-03). Hughes had no other information about the CI and had never dealt directly with him. (A105). The information relayed by the Intelligence Division, as testified to by Hughes, did not include the informant's veracity, reliability, basis of knowledge, and/or opportunity to observe Khan. (A102-05).

Hughes, accompanied by defendants Officer Bessen and Officer Nicholson, then drove by and took a look at the building. (A107-08). Hughes never saw Khan leave the establishment or enter the car. (A108-09).

The officers sat for a long time waiting for Khan to return to the vehicle, during which either Hughes or Bessen ran the plate number. (A110). The database returned Khan's name as the owner of the vehicle. (A112). The database revealed

that Khan had a business carry license. (A114). Hughes does not remember any limitations to the license being listed on the database screen. (A115).

In fact, a printout of the database search reflects that the entry for Khan's concealed carry license was simply "CB" without any restrictions. (A71).

After Khan's car began to move, Bessen initiated the stop. (A120).

When Khan saw the lights of the officers' vehicle, he took the gun from his person and put it in his glove box. (A269). This was the procedure he would always follow in order to show respect to the officers as well as for the safety of himself, the passengers, and the officers. (A269).

Khan was approached by two officers including Officer Bessen. (A270). He advised the officers that he was a concealed carry permit holder, that his weapon was in the glove box, and that his weapon ID, permit, and military ID were in the sun visor. (A271, 276). Officer Bessen said "I did not ask you that, step out of the vehicle," and Khan did step out of the vehicle. (A272). The officers moved Khan and all his relatives behind the car. (A272). They were then joined by defendant officers from a second car. (A273).

At a certain point, Bessen stated that he had found the firearm. (A277). At that point, Khan was put in handcuffs. (A277). Although Bessen saw and vouchered the concealed carry permit (A130), based on the database saying CB or business carry, Bessen arrested Khan and charged him with a misdemeanor (A130-31). Both the

6

arrest report and the complaint report specify that Khan was arrested for violating Section 400.00 of the New York Penal Law, namely, violating the terms of his carry permit. (A59, 63-64). Neither document specifies any other offense. (A59-66)

Notably, Hughes, who was the ranking officer at the scene (A305), testified that he was never made aware of the changes to the licensing rules (A303), had no detailed knowledge of different types of permits (A304), and did not recall receiving any training from the NYPD regarding the scope of gun licenses (A308). He stated further that the face of Khan's license had "conflicting information" from what came back in the database, and that he was confused between "the license produced" and the "observation on [his] phone of what's called a Business Carry license." (A306-07). Defendant Nicholson likewise testified that he was never informed of the 2022 changes to the firearm licensing rules. (A316).

After his arrest, Khan was booked and held overnight in a cell before making arraignment more than 30 hours later. The District Attorney's office charged him with criminal possession of a weapon in the second and fourth degrees, possession of a firearm, and possession of pistol ammunition, with Bessen signing the criminal complaint despite its falsity. (A96). Per a certificate of disposition from the Kings County Supreme Court, all these charges were dismissed on February 23, 2024. (A96). The reason for the dismissal was the DA's determination that Khan in fact had a valid concealed carry license and was entitled to carry the firearm and

7

ammunition. (A83-84).

Pursuant to a temporary suspension, Khan surrendered his weapons to the NYPD. (A76-77, 79-81). On February 27, 2024, following the dismissal of all charges, Khan emailed Officer Astarita informing him of the dismissal and requesting the return of his weapons. (A83). The email set forth the circumstances of the traffic stop and also disclosed that Khan was a retired United States Army staff sergeant. (A83). Nevertheless, Astarita did not recommend continuation of Khan's licenses until March 16, 2024, and the continuation was not approved by Astarita's superiors until March 29, 2024. (A87-88). Khan was informed of the reinstatement of his license by letter dated April 2, 2024 and picked up the weapons the following day. (A89).

When Khan picked up the weapons, he observed that both the guns and ammunition were engraved with numbers. (A282). He asked the property clerk officer what was going on, and he was told he would have to speak to the arresting officer. (A283, 284). He attempted to speak to Officer Bessen at the 75th Precinct but was unable. (A286-87). Because of the engraving, Khan hasn't used the concealed carry weapon because he is nervous about what might happen if he were stopped with it. (A289).

According to Detective Malcolm Lewis, he engraved the firearm and ammunition because an arrest had occurred and the engraved numbers would be used

8

to establish a chain of custody. (A165-67). The relevant NYPD policy ordinarily leaves it to the firearms examiner's discretion to mark a firearm or other evidence with an engraving tool; however, "Members of the Service (MOS) firearms *or firearms that may be returned to a registered owner* should not be engraved." (A92, ¶ 5.2.1(1)) (emphasis added).

On or about March 25, 2024, Khan timely commenced the instant action. (A8). The Third Amended Complaint, which was the currently operative complaint as of the summary judgment litigation, alleges causes of action under 42 U.S.C. § 1981 for race/color/national origin discrimination, under 42 U.S.C. § 1983 for denial of Second Amendment rights, false arrest, and false imprisonment (Second and Fourth Causes of Action), and for Monell liability (Third Cause of Action). (A28).

By Notice of Motion filed January 20, 2026, Defendants-Appellees moved for summary judgment. (A34-35). Their moving memorandum contended that probable cause existed to arrest Khan (albeit, notably, not for the crime he was actually charged with), that his claim under 42 U.S.C. § 1981 and his Second Amendment claim failed as a matter of law, that Khan failed to establish an claim against three of the individual defendants, that the remaining individual defendants were entitled to qualified immunity, and that Khan's Monell claim failed for lack of an underlying constitutional violation. (A181-212).

In response to the motion, Khan did not oppose dismissal of his § 1981 claim

9

and of the claims against individual defendants Jara and Eldiasty, but contended that triable issues of fact remained as to all other claims and defendants. (A341-73). Defendants-Appellees submitted reply papers. (A374-91).

By Memorandum Decision and Order dated April 6, 2026, the district court (Hon. Brian M. Cogan, J.) granted the motion. (A426-33). Notably, in the court's discussion of the evidence, it acknowledged that Officer Bessen was "probably confused by what a 'business carry' license was, and even more confused that [Khan's] physical license didn't match what he saw in the database" when he arrested Khan "purportedly for violating N.Y. Penal Law ('NYPL') § 400.00." (A428). Nevertheless, the court found that Bessen had probable cause to arrest Bessen for a different offense, namely the safe-storage provisions of NYPL § 265.45(2). (A431-32).[3] The court determined that the tip received from the informant, combined with the officers' observation of a vehicle and individual matching the informant's description, was "sufficient to establish probable cause to believe the uncorroborated information, i.e., that plaintiff stored his firearm in his glove box in violation of NYPL § 265.45(2)." (A432-33). In light of the district

---

[3] The district court appears to have partially misunderstood Khan's arguments in opposition. Contrary to the district court's opinion, Khan did not "contend[] that defendants must establish that there existed probable cause to arrest [him] under PL § 400.00 [only]" (A431); instead, Khan specifically contended that there was no probable cause to arrest him *either* under § 400.00 or for either of the alternative offenses suggested by Defendants-Appellees (A356-61).

court's finding as to NYPL § 265.45(2), it did not reach the alternative probable cause or qualified immunity arguments raised by the defendants. (A433).

Finally, the district court disposed of Khan's remaining claims by stating that "because plaintiff's false arrest claim fails, his remaining claims necessarily fail, too." (A433).

Judgment was entered pursuant to the district court's decision on April 7, 2026 (A434) and Khan filed a timely notice of appeal (A435).

## SUMMARY OF THE ARGUMENT

1.      The district court erred in finding that probable cause existed to arrest Khan.  It is undisputed that probable cause did not exist to arrest him for the crime of which he was actually charged, i.e., carrying a firearm outside the bounds of his license, because he had an unrestricted concealed carry permit. Moreover, the informant's tip was not sufficient to establish probable cause as to either of the alternative offenses proposed by the defendants. Contrary to the district court's opinion, the fact that the confidential informant correctly described Khan and his car did not establish that his assertion of *illegality* was reliable as the law requires. Moreover, an informant at or near the catering hall entrance would have been able to clearly see Khan and his car but would not have been able to see whether Khan put the gun in his glove box as opposed to a safe which was accessed from a chain located near the glove box. As such, the tip from the informant, who was otherwise

11

unknown and unvetted and whose vantage point was not disclosed to the arresting officers, was insufficient to justify the arrest, or at minimum, raises triable issues of fact. Nor did probable cause exist under NYPL § § 265.01-e(2)(o), given that Khan didn't actually attempt to bring a firearm into the catering hall but instead turned around while still outside the club and secured the gun as soon as he learned that alcohol was being served within. Finally, given that the existence of probable cause hinges on disputed issues of fact, qualified immunity does not protect the arresting officers as a matter of law; thus, the false arrest claim should be reinstated so that the relevant issues may be determined by a jury.

2.     Contrary to the district court's determination, Defendants-Appellees violated Khan's Second Amendment rights independently of whether his arrest was supported by probable cause. Specifically, as a person with a full concealed carry permit who was not charged with or suspected of any other criminal activity, he was entitled to return of his firearm immediately upon dismissal of the charges against him rather than having to wait for a further "investigation." Moreover, Khan's Second Amendment rights were also impaired by the engraving of the firearm, which was against Defendants-Appellees' own policy and rendered unusable the only firearm that he was licensed to concealed-carry.

3.     Finally, given that triable issues exist concerning whether Khan's Second and/or Fourth Amendment rights were violated, and given the unrefuted

12

evidence that these violations resulted from a municipal policy of failure to train officers concerning firearm license scope and nomenclature and/or the policies of the NYPD firearms unit, Khan's Monell claim should be reinstated along with his false arrest and Second Amendment claims.

**SUMMARY JUDGMENT STANDARD**

This Court reviews a grant of summary judgment de novo. Chunn v. Amtrak, 916 F.3d 204, 207 (2d Cir. 2019). The party moving for summary judgment "bears the burden of demonstrating the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). For the court to grant summary judgment, the movant must "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017), quoting Fed. R. Civ. Pro. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where, as here, the non-moving party would bear the burden of proof at trial, "the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-

13

moving party's claim." <u>Nick's Garage, Inc.</u>, 875 F.3d at 114, <u>citing</u> <u>Celotex</u>, <u>supra</u>.

However, when deciding a motion for summary judgment, a court must consider "the evidence in the light most favorable to the non-moving party," <u>Gould v. Winstar Communications, Inc.</u>, 692 F.3d 148, 157-58 (2d Cir. 2012), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004). Furthermore, "it is beyond any doubt that circumstantial evidence may suffice to prove adjudicative facts." <u>O'Brien v. Nat'l Gypsum Co.</u>, 944 F.2d 69, 72 (2d Cir. 1991).

## POINT I

### TRIABLE ISSUES EXIST CONCERNING WHETHER PROBABLE CAUSE EXISTED TO ARREST KHAN FOR ANY OFFENSE AND WHETHER THE ARRESTING OFFICERS ARE PROTECTED BY QUALIFIED IMMUNITY

Plaintiff Khan was arrested for one and only one offense: carrying a firearm outside the terms of his permit in violation of Section 400.00 of the New York Penal Law – and was thereafter charged by the District Attorney's office with criminal possession of a weapon in the second and fourth degrees (NYPL §§ 265.03(3), 265.01(1)), criminal possession of a firearm (NYPL § 265.01-b), and possession of pistol ammunition (NYC Admin. Code § 10-131(i)(3)). In the court below, defendants wisely did not contend that probable cause existed to arrest him for any

14

of these offenses, given that Khan concededly had a valid unrestricted concealed-carry permit, that this permit was an absolute exemption to both the NYPL Article 400 count and the Article 265 charges, see PL § 265.20(3), and that a person such as Khan who is "authorized to possess a pistol or revolver" may also lawfully posses pistol ammunition under the Administrative Code, see NYC Admin. Code § 10-131(i)(3). Khan was factually, legally and definitionally innocent of all these offenses, the defendant officers were concededly aware of the permit that rendered him innocent, and hence, there cannot possibly have been reasonable cause for them to believe that Khan committed any of the charged crimes.

Defendants-Appellees nevertheless contended, and the district court partially agreed, that Khan was lawfully arrested because probable cause existed to charge him with two *other* crimes, namely failure to safely store rifles, shotguns and firearms in the first degree under Section 265.45(2) of the New York Penal Law and attempted criminal possession of a firearm in a sensitive location under NYPL § 265.01-e(2)(o).[4] Notably, none of the defendant officers testified that they believed, reasonably or otherwise, that Khan had committed either of these crimes, nor is there the slightest hint that their arrest of Khan was predicated upon either of the cited

---

[4] Although the district court reached only the NYPL § 265.45 offense, Defendants-Appellees are likely to argue NYPL § 265.01-e as an alternative ground for affirmance, and hence, Defendant-Appellant will discuss both offenses in this brief.

15

statutes. There is hence no evidence that Khan's arrest was based on a determination of probable cause under NYPL §§ 265.45(2) or 265.01-e(2)(o). But even aside from this, given the facts available to the officers at the time of the arrest, triable issues exist concerning whether they in fact had probable cause as to either of these alternative offenses, and disputed issues of fact also preclude summary judgment in their favor on the issue of qualified immunity.

## A. Probable Cause Standard.

Probable cause is determined based on a "totality of the circumstances approach." Illinois v. Gates, 462 U.S. 213, 231 (1983). "In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. However, a mere suspicion or hunch will not amount to probable cause. See id. at 239, citing Nathanson v. United States, 290 U.S. 41 (1933) (conclusory statement that an officer "has cause to suspect and does believe that" liquor is being illegally brought into the United States did not suffice as probable cause). Moreover, exculpatory evidence known to the officer "may negate a finding of probable cause." Kuehl v. Burtis, 173 F.3d 646, 651 (8th Cir. 1999); see also Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) ("[A]n officer may not disregard plainly exculpatory evidence"); Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003) ("[U]nder some circumstances, [an] officer's awareness

16

of the facts supporting a defense can eliminate probable cause").

Where probable cause is based in whole or in part on information provided by a confidential informant, courts look to the informant's "veracity, reliability, and basis of knowledge." Gates, 482 U.S. at 230. While it is not mandatory to disregard an informant's statements simply because he or she "has no proven record of truthfulness or accuracy," the fact remains that "a criminal informer is less reliable than an innocent bystander" and "a face-to-face informant must ... be thought more reliable than an anonymous telephone tipster." United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004). "[T]ips by anonymous informants, standing alone, are generally insufficient to establish probable cause to arrest" unless the police "independently establish that the tip is reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Marinis v. Village of Irvington, 212 F. Supp. 2d 220, 223 (S.D.N.Y. 2002), citing and quoting Florida v. J.L., 529 U.S. 266, 272 (2000); see also Thomas v. City of New York, 2018 WL 4328825, at *14 (E.D.N.Y. 2018) (tip from confidential informant did not amount to probable cause without a demonstration of his reliability and basis of knowledge).

**B.    Probable Cause Did Not Exist for Failure to Safely Store a Firearm.**

Section 265.45(2) of the New York Penal Law provides in pertinent part that "[n]o person shall store or otherwise leave a rifle, shotgun, or firearm *out of such person's immediate possession or control* inside a vehicle without first removing the

17

ammunition from and securely locking such rifle, shotgun, or firearm in an appropriate safe storage depository out of sight from outside of the vehicle" (emphasis added). While "a glove compartment or glove box shall not be considered an appropriate safe storage depository," a "safe or other secure container" suffices. See PL § 265.45(3).

In this case, as discussed above, Khan had an approved, thumbprint-locked gun safe located under the back passenger seat of his car (A251-52) and that throughout the time he was in the catering hall, his weapon was locked in the safe (A256). After returning to his car, he took the weapon out of the safe and put it on his person (A264-65), and removed it from his person and put it in the glove box only when he saw flashing lights and knew he was being pulled over (A269).[5] Thus, the only time the weapon was in the glove box was when Khan was in the car, sitting in the driver's seat with the glove box within arm's reach – which means that the weapon was "within his immediate possession and control" at the time and was not stored in violation of the statute.[6] At all other times, the weapon was either on his

---

[5] Plaintiff-Appellant notes that, at the time of his deposition, defendants had not raised the possibility that he might have violated PL § 265.45, and therefore, he had no reason to lie or shade the truth about when and how long the firearm was in the glove box.

[6] PL § 265.45 does not define "immediate possession and control" and research reveals no case law interpreting that term in the context of that particular statute. In the context of warrantless searches, however, the Supreme Court has held that the area within the "immediate control" of a person includes any area "into

18

person or locked in the approved thumb-locked safe which was under the passenger seat and therefore "out of sight from outside of the vehicle" as the statute requires.[7]

Notably, the arresting officers did not observe Khan, his car, or the glove box at any time prior to stopping him. Thus, the only point at which they saw the weapon in the glove box was when Khan, who was in immediate possession and control of it, took it out. Moreover, to the extent that the confidential informant may have claimed that Khan put the weapon in the glove box at an earlier time, the defendant officers had no information regarding the CI's veracity, reliability, or – critically in this case – basis of knowledge. They had no way of knowing where the informant was standing, what angle or line of sight he had to observe what Khan was doing, and whether he even had any way to tell whether Khan was putting the weapon in the glove box as opposed to the safe which was located in the same vehicle and which was accessed via a cable attached to the front of the passenger compartment near where the glove box would be. As stated above, information obtained from a

---

which [he] might reach in order to grab a weapon or evidentiary items," Chimel v. California, 395 U.S. 752, 763 (1969), and there is no persuasive reason why a different definition should apply under PL § 265.45, which is obviously intended to ensure that guns in vehicles are safely locked away when their owners are outside the vehicle.

[7] To the extent that Defendants-Appellees' reply papers included testimony from Khan's companions Hooper and Sing that partly contradicted Khan's account of where the gun was at each point in time, this presents a question of credibility that cannot be decided on summary judgment.

19

CI must be "reliable in its assertion of *illegality*, not just in its tendency to identify a determinate person," J.L., 529 U.S. at 272 (emphasis added), and since the defendant officers never observed any *illegal* storage of the weapon in the glove box (as opposed to it legally being there while under Khan's immediate control), there was insufficient corroboration of the informant's tip to justify an arrest under PL § 265.45, or at minimum, the existence of probable cause hinges on triable issues of fact regarding the extent and reliability of information in the officers' possession.[8]

To be sure, the district court found that because the arresting officers observed that Khan and his car matched the CI's description, this provided sufficient indicia of accuracy for them to have probable cause to believe the CI's tip about Khan putting the weapon in his glove box. This was error. Again, the tip must be shown to be reliable not merely in its description of a person but in its assertion of illegality, and the fact that the CI described Khan and his car correctly did not show that he reliably accused Khan of an alleged crime. Anyone can describe a person or car and accuse him of a crime. Moreover, and just as much to the point, Khan and his car were both things that a CI who was presumably at or near the entrance to the catering hall would be able to clearly see, but an informant in that position *would not*

---

[8] Furthermore, as the district court correctly stated, law enforcement officers may not rely on after-acquired information to show probable cause, see Toure v. Port Auth., 2025 WL 3674392 (E.D.N.Y. 2025), so even if the officers had observed the firearm being *illegally* stored in the glove box, which they did not, this would not retroactively justify the arrest.

20

necessarily have been able to see, in darkness, the movements that Khan was making some 100 feet away (A260), and would not have been able to accurately discern whether Khan was putting his weapon in his glove box. This is particularly true since, as Khan testified without contradiction, the gun safe in his car was accessed by pulling on a chain that was located near the glove box itself. As such, there are at minimum triable issues of fact, which must be decided by a jury, concerning whether the CI's tip was sufficient to justify the arrest, and summary judgment on this issue should have been denied.

**C.      Probable Cause Did Not Exist for Attempted Possession of a Firearm in a Sensitive Location.**

Nor was there probable cause to believe that Khan had violated Section 265.01-e of the Penal Law. This statute provides that "[a] person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, *and such person knows or reasonably should know such location is a sensitive location*" (emphasis added). The term "sensitive location" includes, as pertinent here, "any establishment holding an active license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption." See NYPL § 265.01-e(o).

Khan clearly did not attempt to violate this statute. As stated above, Khan's

cousin took him out to a private hall as a "surprise" (A247, 254), that he observed it to be a catering hall without any signs stating that weapons were prohibited (A253, 255), that he didn't know what kind of facility it was prior to being there (A253, 255), that he asked the security guard whether weapons were allowed (A253), and that because he saw that there was alcohol in the facility, he returned to his car and secured his weapon (A253-54). In other words, when Khan approached the catering hall with his weapon, he did not know that it was a "sensitive facility" and thus did not have the mens rea required by PL § 265.01-e, and as soon as he *did* see that there was alcohol within, he turned around, secured his gun in the car safe, and entered the catering hall unarmed. Far from violating the law, he did exactly what the law required.

Defendants-Appellees contended below, and are likely to contend before this Court, that simply by walking up to the door, Khan *attempted* to violate the statute, but this is not so. In New York, the following standard applies where a defendant is charged with attempt to commit a crime:

> It is well established that the "law does not punish evil thoughts, nor does it generally consider mere preparation sufficiently dangerous to require legal intervention" by imposing attempt liability (People v. Bracey, 41 N.Y.2d 296, 300, 392 N.Y.S.2d 412, 360 N.E.2d 1094 [1977] [citations omitted]). Rejecting the more lenient "substantial step" test and adhering to the close-proximity test (Mahboubian, 74 N.Y.2d at 191, 544 N.Y.S.2d 769, 543 N.E.2d 34), our Court has repeatedly reaffirmed that, to constitute an attempt, "the defendant's conduct must

22

have passed the stage of mere intent or mere preparation to commit a crime" (Naradzay, 11 N.Y.3d at 466, 872 N.Y.S.2d 373, 900 N.E.2d 924; see also People v. Rizzo, 246 N.Y. 334, 337, 158 N.E. 888 [1927]). Although the "act need not be 'the final one towards the completion of the offense'" (Bracey, 41 N.Y.2d at 300, 392 N.Y.S.2d 412, 360 N.E.2d 1094, quoting People v. Sullivan, 173 N.Y. 122, 133, 65 N.E. 989 [1903]), it must be "so near to its accomplishment that in all reasonable probability the crime itself would have been committed, but for timely interference" (Rizzo, 246 N.Y. at 334, 158 N.E. 888 ["The act or acts must come or advance very near to the accomplishment of the intended crime"]). Stated differently, the acts must come "dangerously near" commission of the completed crime (Naradzay, 11 N.Y.3d at 466, 872 N.Y.S.2d 373, 900 N.E.2d 924; see People v. Werblow, 241 N.Y. 55, 61, 148 N.E. 786 [1925] ["Acts in furtherance of a criminal project do not reach the stage of an attempt, unless they carry the project forward within dangerous proximity to the criminal end to be attained"]).

People v. Lendof-Gonzalez, 36 N.Y.3d 87, 92-93 (2020). Thus, planning or talking about a crime, even in detail, does not rise to the level of attempt, see id.; see also People v. Corporan, 200 A.D.2d 155, 158 (1st Dept. 1994), and even going to the place where the crime is to be committed is not an attempt, particularly where the mens rea evidence is sketchy or equivocal, see People v. Hiedeman, 189 A.D.3d 1902, 1905-06 (3d Dept. 2020) (evidence was insufficient to constitute attempt to sexually abuse a child where, although defendant drove to the site, he took no further action and his statements were "passive and noncommittal").

In this case, Khan did not come "dangerously close" to violating NYPL § 265.01-e. Merely walking to the door of the catering hall without knowing there was

23

alcohol inside did not constitute an attempt to commit a crime, especially since he turned away and secured his weapon immediately upon seeing that alcohol was being served. He did not try to push or force his way in or even to argue with the security guard, meaning that his actions upon reaching the door were *at most* "passive and noncommittal" rather than evincing the mens rea required to go forward with the crime, see Hiedeman, supra. Nothing that the defendant officers knew, either from personal observation or via the informant, amounted to anything more than that. Indeed, given that the information Sergeant Hughes testified to receiving was that Khan had attempted to enter an "establishment," they were not even informed whether the premises served alcohol. Thus, again, there was no probable cause to arrest Khan for violating PL § 265.01-e, or at minimum, triable issues of fact preclude judgment as a matter of law on this question.

**D.     Triable Issues Exist Concerning Qualified Immunity.**

Nor was the arrest protected by qualified immunity as a matter of law. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity involves two inquiries: first, whether the defendant officers violated a constitutional right, and second, whether the right at issue was

24

clearly established at the time of the incident giving rise to the lawsuit. See id. at 232.

Qualified immunity is an affirmative defense that the defendants have the burden of establishing on a motion for summary judgment. See Bailey v. City of New York, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015). Summary judgment on qualified immunity may "only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" Id., citing Ashcroft v. al-Kidd, 563 U.S. 730, 735 (2011). Where the issue of qualified immunity turns on disputed facts, "the factual questions must be resolved by the factfinder" rather than this Court. See Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007); see also Felmine v. City of New York, 2011 WL 4543268, *10 (E.D.N.Y. 2011) (denying summary judgment on qualified immunity grounds where the facts allegedly relied upon to establish probable cause were disputed).

As to the arresting officers, defendants do not dispute that there is a clearly established constitutional right not the arrested without probable cause, nor do they claim that there was even arguable probable cause for the crime of which Khan was actually arrested. And wisely so, given that the basis for such arrest was a conceded mistake of fact concerning the terms of Khan's carry permit, and "a mistake of fact…

25

in the absence of an additional *jury finding* that the mistake was reasonable… is insufficient to support an officer's claim that he is entitled to qualified immunity," Jones v. Treubig, 963 F.2d 214, 231 (2d Cir. 2020) (emphasis added). Here, defendants do not contend that it is reasonable for NYPD officers to misapprehend the scope of firearms permits *issued by the NYPD itself*, and research does not reveal any case that would entitle them to immunity for such a misapprehension – indeed, what scant case law exists supports the opposite conclusion. See Woodard v. Brown, 2009 WL 10700050, at *13 (N.D. Ga. 2009) (no qualified immunity where officers arrested plaintiff based on a misunderstanding of carry requirements). At minimum, under Jones, the reasonableness of what defendants coyly describe as "confusion regarding Plaintiff's firearm permit" must be determined by a jury rather than the Court.

Nor was there even "arguable probable cause" to arrest Khan for violating PL § 265,01-e and/or NYPL § 265.45(2). As discussed in Point I(C), the only information available to the defendant officers concerning PL § 265.01-e was that Khan walked to the door of the catering hall, spoke to a security guard, and then immediately returned to his car and secured his weapon before entering, which are facts that no reasonable or competent police officer would construe as being "dangerously close" to knowingly and unlawfully entering a "sensitive location."

And as to NYPL § 265.45(2), as discussed in Point I(B), Khan's weapon was

26

in the gun safe or on his person at all times other than immediately before the traffic stop, when he put it in the glove box for his and the officers' safety, and it was thus never illegally stored out of his "immediate possession or control." Nothing observed by the officers even arguably suggested otherwise. Moreover, to the extent that the officers relied upon information allegedly conveyed by the anonymous confidential informant, the reasonableness of their doing so hinges on disputed facts concerning the informant's veracity, reliability, and basis of knowledge, and it has been held that these issues must be resolved by a jury even if the informant is partly corroborated. See Ocasio v. Chalker, 2007 WL 1544205, at *3-4 (D. Conn. 2007) (denying summary judgment where defendant officer did not observe the specifically illegal conduct stated by the informant); see generally J.L., 529 U.S. at 272 (informant's testimony must be shown reliable on "illegality").

In sum, "[b]ecause there are issues of fact relating to the actions of the plaintiff and the officers at the time of the arrest, and these issues relate to the reasonableness of the officers' belief that there was probable cause to arrest, the motion for summary judgment on the basis of qualified immunity [must be] denied." Vitalone v. City of New York, 2018 WL 1507591, at *6 & n.4 (S.D.N.Y. 2018). Alternatively, and at minimum, the reasonableness of the defendants' belief that they had probable cause to arrest Khan turns on disputed facts which must be resolved by a jury. See Zellner, supra; Felmine, supra. While the defendants are free to present their qualified

27

immunity defense to the jury, they are not entitled to judgment as a matter of law.

## POINT II

## KHAN'S SECOND AMENDMENT CLAIM SHOULD NOT HAVE BEEN DISMISSED

In addition to being deprived of his rights under the Fourth Amendment, Khan was also deprived of his Second Amendment rights. Contrary to the district court's finding, Khan's Second Amendment claim *did not* hinge on his false arrest alone. Instead, this deprivation occurred at three junctures, the *first* of which was the arrest, but also when defendant Astarita failed to immediately return the firearm upon dismissal of the criminal charges against Khan, and when the carry weapon was returned to Khan defaced with engravings. For purposes of clarity, plaintiff's Second Amendment claims against the arresting officers begin on the date they seized the subject weapon; however, plaintiff limits his claims against Astarita to the time period beginning February 27, 2024, when he informed Astarita that all criminal charges against him had been dismissed.

In this case, there can be no doubt that when Khan was stopped, searched and arrested and his firearm was seized on November 26, 2023, the Supreme Court recognized an individual constitutional right to bear arms. See District of Columbia v. Heller, 554 U.S. 570 (2008); McDonald v. City of Chicago, 561 U.S. 742 (2010); New York Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022).  This right extends "to all instruments that constitute bearable arms," and to both possession and

28

carrying. See Heller, 554 U.S. at 581-84. In Bruen, which was the most recent Supreme Court decision on the subject as of 2023, the Court also held that the Second Amendment operated as a direct restriction on the states' ability to restrict the use and carrying of firearms, in public as well as in the home, and that firearms may not be taken away simply because doing so would serve an important government interest. See Bruen, 142 S. Ct. at 2126. Courts have held that right protected by these cases extends to arbitrary restrictions on concealed carry. See, e.g., Antonyuk v. James, 120 F.4th 941, 1044-47 (2d Cir. 2024) (affirming relevant portion of injunction upon a finding that it was likely unconstitutional to restrict licensed individuals from concealed-carrying in places open to the public).

The district court, as discussed above, held that the failure of Khan's false arrest claim meant that his Second Amendment claim fell with it. (A433). As discussed in Point I, the district court was wrong about the false arrest claim failing. But even aside from that, Khan's Second Amendment rights were violated at two further junctures: when defendant Astarita did not return his weapon immediately upon dismissal of the criminal charges, and when it was returned defaced by engravings.

Defendants-Appellees argued below that Astarita did not violate Khan's Second Amendment rights because he was not the final decision-maker, because he wrapped up his investigation and recommended continuation of Khan's licenses

29

within a period that he described as unusually quick, and because Khan could have but did not avail himself of a procedure to request that the suspension be vacated pending resolution of his criminal charges. (A201-02, 206). The last of these is a moot point given the time limitation on plaintiff's claims against Astarita, because the issue of whether or not he could have sought this temporary remedy *before* the charges were dismissed[9] is immaterial to whether he had a right to the immediate return of his weapons and licenses *after* the dismissal.

And he did. Once the charges were dismissed, Khan reverted to his pre-existing status of a law-abiding Bronze Star and Purple Heart veteran turned federal law enforcement officer who had been issued a license and who, under Bruen, thus had a Second Amendment right to public carry. The issue of whether Astarita conducted his subsequent investigation with unusual speed is a red herring, because there should not have been any further investigation at all beyond the few minutes it would have taken to contact the District Attorney's office and confirm the dismissal of the criminal case. There was nothing else to investigate, and no other governmental interest that Bruen permitted to be balanced against Khan's right to bear arms. Astarita should have signed off on the return of Khan's weapons on February 27, not March 16, and whether or not he was the final decision-maker, his

---

[9] In any event, in the experience of the undersigned, such applications are routinely denied.

signature was necessary to start the process, so his withholding of it during this period did deprive Khan of his Second Amendment rights by delaying the day of the ultimate return.[10]

Astarita is also not entitled to qualified immunity. Defendants argued below that the "sea change in Second Amendment jurisprudence" following <u>Bruen</u> meant that Astarita's investigation did not violate a "clearly established" right. (A209). But a right is not foreclosed from being "clearly established" because it is recent or because it represents a "sea change." Certainly, defendants do not cite any cases holding that officers are entitled to ignore a Supreme Court decision because that decision's effects are major; to the contrary, *any* Supreme Court decision that defines a right with reasonable specificity is enough to clearly establish the law. <u>See</u> <u>Teller v. Fields</u>, 280 F.3d 69, 84 (2d Cir. 2000). Given that, as set forth above, <u>Bruen</u> and its antecedent cases establish that law-abiding citizens with permits have a Second Amendment right to possess and carry weapons in public, Astarita's continued withholding of Khan's weapons after being informed of the dismissal of all charges is not entitled to immunity.

---

[10] Plaintiff submits that there should not have been a review process either, and that the very fact that municipal policy required further review and "investigation" despite the dismissal of criminal charges supports a <u>Monell</u> claim (<u>see</u> Point III below), but agrees that the existence of such process and any delays by higher-ups in signing off on Astarita's recommendation is not to Astarita's account.

31

Nor is <u>Brewer v. Vanmarter</u>, 2024 WL 2131521, at *4 (W.D. Va. 2024), cited by defendants, to the contrary. In <u>Brewer</u>, which involved a pre-<u>Bruen</u> retention of a firearm by Roanoke County police, the court held that it was "nonsensical… to hold a police officer liable for not returning a firearm *to a defendant he knew had a pending violent felony charge*" (emphasis added). But whatever may be the merit of <u>Brewer</u>'s holding to a plaintiff who "ha[s] a pending violent felony charge," it has no bearing on the period after February 27, 2024 when Khan informed Astarita he had no charges pending, and since Khan has limited his claim against Astarita, as opposed to the arresting officers, to that period (<u>see</u> Point II), Astarita is not entitled to summary judgment on qualified immunity grounds.

Finally, contrary to Defendants-Appellees' contention below (A202-04), the engraving of the firearm also constituted a Second Amendment violation. As detailed in the Statement of Facts, the NYPD's engravement policy was not discretionary under these circumstances because it prohibited engravement of weapons that might be returned to their registered owner – which was an obvious possibility given that Khan held a valid permit and that the criminal charges against him were subject to dismissal. Moreover, defendants' contention that Second Amendment rights are only implicated if a plaintiff's "use" of a firearm is impaired falls short, given that both federal and state law prohibit the use of defaced firearms and, as Khan testified, he can no longer carry or use the weapon for fear of the legal

32

repercussions. This Court should therefore reverse and reinstate Khan's Second Amendment claim.

## POINT III

### SUMMARY JUDGMENT SHOULD NOT HAVE BEEN GRANTED ON KHAN'S <u>MONELL</u> CLAIMS

Finally, this Court should reverse the district court's grant of summary judgment on Khan's <u>Monell</u> claims, which are twofold: (1) that the City had a policy of conducting discriminatory arrests of licensed firearm owners based on race; and (2) that the City failed to update its firearm licensing database and/or train NYPD officers concerning the meaning of "business carry" and the 2022 change in firearm license nomenclature.

Defendants contended, and the district court accepted, that the <u>Monell</u> claim failed because there was no underlying constitutional violation, but as discussed in Points I and II, the record *does* establish an underlying violation of both Khan's Fourth Amendment and Second Amendment rights. Moreover, qualified immunity applies only to individual defendants, not to municipalities, <u>see</u> <u>Askins v. Doe No. 1</u>, 737 F.3d 248, 254 (2d Cir. 2013); <u>accord</u> <u>Gugino v. City of Buffalo</u>, 2022 WL 5240162, at *2 (W.D.N.Y. 2022) ("that qualified immunity may relieve individual Defendants from liability, does not negate those actions by a state actor are nevertheless prerequisite to any Monell claim"), meaning that these underlying violations will support <u>Monell</u> liability even if the individual defendants are immune,

33

which in any event, as stated above, they are not.

Defendants claimed below that Khan could not prove a pattern of race-based arrests; however, that assertion is premature at this time because Monell discovery has been bifurcated and plaintiff has had no opportunity to take discovery concerning other cases in which NYPD officers have stopped licensed firearm owners. (R214, ¶ 6).[11] Without such discovery, plaintiff cannot establish whether there is a racial disparity between the stops that resulted in arrest and those that did not, and/or whether the NYPD had a pattern of treating carry permits with undue skepticism based on race. (R214, ¶ 6). The district court should thus have denied summary judgment on this issue without prejudice to renewal after the completion of Monell disclosure. See Fed. R. Civ. Pro. 56(d); Hollins v. City of New York, 2014 WL 836950, at *4 (S.D.N.Y. 2014).

Turning to the City's failure to update the NYPD firearm database and failure to train officers on the meaning of "business carry" and/or the updated nomenclature, Defendants-Appellees argued below that this "amount[ed] to, at most, mere negligence." (A210). Both of the cases cited for this proposition, however, are entirely distinguishable – Garcia v. Bloomberg, 662 Fed. App'x 50, 54 (2d Cir. 2016), involved a one-time alleged failure to use optimal crowd control procedures,

---

[11] The references in the Edelstein Declaration to the bifurcation of Monell discovery, and to the topics upon which plaintiff has not had an opportunity to take discovery, satisfied the "affidavit or declaration" requirement of Rule 56(d).

34

and <u>Brogdon v. City of New Rochelle</u>, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) involved generalized and nonspecific claims of failure to train. In contrast, the facts of *this* case fall comfortably within the parameters under which failure to train amounts to deliberate indifference under <u>Walker v. City of New York</u>, 974 F.2d 293 (2d Cir. 1992) and its progeny.

In <u>Walker</u>, the Second Circuit held that a <u>Monell</u> failure-to-train claim requires three elements: (1) that the municipality's policymakers know to a moral certainty that their employees will confront a given situation; (2) that the situation either presents the employees with a difficult choice which training will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employees will frequently cause the deprivation of a citizen's constitutional rights. <u>See</u> <u>id.</u> at 297-98; <u>Reynolds v. Giuliani</u>, 506 F.3d 183, 192 (2d Cir. 2007); <u>Valdiviezo v. Boyer</u>, 752 Fed. App'x 29, 31 (2d Cir. 2017). A "difficult choice" is one for which "more than the application of common sense is required." <u>Vasconcellos v. City of New York</u>, 2016 WL 403474, at *3 (S.D.N.Y. 2016), <u>citing</u> <u>Walker</u>, 974 F.2d at 297.

In this case, it is self-evidently "morally certain" that NYPD officers, in the course of policing a city of eight million people of whom tens of thousands hold carry permits, will encounter licensed firearm owners with their firearms. Moreover, it "requires more than the application of common sense," and is thus a "difficult

35

choice," to know (1) that "business carry" permits were in fact full concealed-carry permits and were not limited to business premises; and (2) mismatches between the face of a permit that says "concealed carry" and a database entry of "CB," "carry business" or "business carry" are the result of a change in license nomenclature rather than fraud or forgery on the part of the license holder. Neither of these things is intuitive – as the evident ignorance and confusion of *all* the arresting officers makes clear – and both can easily be resolved via training. And finally, the wrong choice by employees – misconstruing a valid permit as being narrower than it is – will frequently lead to false arrests, false prosecutions, and false seizures of firearms in violation of the Second and Fourth Amendments, because anyone stopped outside business premises with a permit that comes back as "business carry" will be presumed to be carrying without a permit. Thus, rather than being mere negligence, the City's failure to ensure that NYPD officers knew the actual contours of the City's firearm licensing regime – whether via training or via updating the database so as to render such training a moot point – was not merely negligence but deliberate indifference.

A Monell claim may also be based on a municipality's failure to implement policies "where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." Reynolds v. Giuliani, 506 F.3d

36

183, 192 (2d Cir. 2007). Here, for the same reasons discussed above, it is clear that when the NYPD changed its firearm licensing rules in 2022, the need to update the database used by officers in the field was "so obvious" and the existence of an inaccurate database "so likely to result in a deprivation of federal rights" – namely false arrest – that the failure to update the database before November 26, 2023 amounted to deliberate indifference to such rights.

Finally, Defendants-Appellees' contention that Khan has only presented evidence of a single incident (A210-11) is misplaced.  For one thing, not only  This is not a case in which Khan requests that this Court *infer* an unwritten custom from a pattern of incidents; instead, it was *admitted* by Officer Astarita – and indeed conceded in the City's moving memorandum below(A189 n.2) – that the NYPD neither updated its database nor conducted relevant training before November 26, 2023. Moreover, a pattern of incidents is not required to establish Monell failure-to-train liability where, as here, constitutional injury is a "highly predictable consequence of the failure to train." Thomas v. Cumberland County, 749 F.3d 217, 225 (3d Cir. 2014), citing and quoting Bryan County v. Brown, 520 U.S. 397 (1997); see also Lynch v. Town of Amherst, 2026 WL 479050, at *2 (W.D.N.Y. 2026) (discussing "highly predictable" doctrine and citing cases).

Accordingly, summary judgment should have been denied on Khan's Monell claim regarding failure to train and/or update the NYPD firearm database.

37

Alternatively, assuming *arguendo* that this Court finds that proof of more than a single incident is necessary – which under <u>Bryan County</u> and its progeny, is not the case – summary judgment should have been be denied as premature because <u>Monell</u> discovery has been bifurcated and plaintiff has not had an opportunity to obtain disclosure on how often carry-permit holders have been arrested by the NYPD despite their possession and display of a valid permit. (A214, ¶ 6). At minimum, in light of the admissions made by Astarita concerning failure to train and failure to update the database, plaintiff is entitled to discovery on this issue before any dispositive ruling is made, and the order appealed from should thus be reversed.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court should reverse the order and judgment below, reinstate Plaintiff-Appellant's claims, remand for further proceedings including trial, and grant such other and further relief to Plaintiff-Appellant as may be just and proper.

Dated:     New York, NY
           June 11, 2026

/s/ Jonathan I. Edelstein_____
JONATHAN I. EDELSTEIN

38

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies pursuant to Fed. R. App. Pro. 32(a)(7)(C) as follows:

1.      This brief complies with the type-volume limitation of Fed. R. App. Pro. 32(a)(7)(B), as modified by Second Circuit Rule 32.1(a)(4)(A), because it contains 9,638 words exclusive of those parts of the brief exempted by Fed. R. App. Pro. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. Pro. 32(a)(5) and the type style requirements of Fed. R. App. Pro. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 2016 in Times New Roman 14-point type.

Dated:     New York, NY
           June 11, 2026

/s/ Jonathan I. Edelstein_____
JONATHAN I. EDELSTEIN

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
  RAFFIQUE N. KHAN,                              :
                                                 :
                           Plaintiff,            :
                                                 :  **MEMORANDUM DECISION AND**
                 -against-                        :  **ORDER**
                                                 :
  CITY OF NEW YORK, *et al.*,                     :   24-cv-2168 (BMC)
                                                 :
                           Defendants.           :
------------------------------------------------------------ X

**COGAN**, District Judge.

Law enforcement is a profession where mistakes are bound to happen. These mistakes can be costly and threaten to disrupt the lives of citizens in the police's path. But not every mistake or disruption is a civil rights violation.

In this case, police arrested plaintiff for criminal possession of a firearm, triggering a law that suspended plaintiff's firearms licenses and forced him to surrender his firearms. As it turned out, the arrest was a mistake, because plaintiff had a lawful concealed carry permit. After his criminal charges were dismissed, plaintiff sued defendants, claiming that the arrest was unconstitutional and the subsequent application of the suspension-surrender law violated his Second Amendment rights. Defendants have moved for summary judgment and, for the reasons below, defendants' motion is granted.

### BACKGROUND

The facts in this case are largely undisputed. Plaintiff is an Army veteran and registered gun owner in New York, who holds both a "Premise Residence Handgun License" and a "Concealed Carry License." Plaintiff properly registered all of his firearms and has no criminal history.

# SPA-1

Shortly after receiving his Concealed Carry License, plaintiff's family came to New York to celebrate what would have been his late mother's 70th birthday. At one point, the group left plaintiff's residence in plaintiff's car, a blue BMW, to attend a "surprise" planned by plaintiff's cousin. Plaintiff took his firearm and his Concealed Carry License with him. When plaintiff parked, plaintiff realized that the "surprise" was a meal at an eatery in his old neighborhood.

Plaintiff was cognizant that even licensed firearms are not permitted in eateries that serve alcohol. So, when plaintiff first approached the eatery (still armed), he asked the employee at the entrance whether alcohol was served. After learning that it was, plaintiff returned to his car and placed the gun inside, and went back to join his family.

At some point, the police "Intelligence Division" was tipped off that someone matching plaintiff's description was in possession of a firearm, tried to enter the eatery, and then put the firearm in the glove box of a blue BMW. Shortly thereafter, Officer Hughes was briefed on the situation and left with Officers Bessen and Nicholson to investigate. The officers located the blue BMW, ran the license plate, and determined that the car belonged to plaintiff. The officers then searched plaintiff's name through various databases, and learned that plaintiff had a "business carry" firearm license.

Before N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), New York used the nomenclature "business carry" to describe a license permitting the holder to conceal a firearm because, at that time, anyone seeking a license to carry a concealed firearm had to show cause, such as a business reason, for doing so. Post-Bruen, *i.e.*, at the time the officers identified plaintiff's firearm license in the database, New York changed the term to a "concealed carry" firearm license. Nonetheless, licenses that were once listed as "business carry" in police databases, such as plaintiff's, were not automatically updated.

**SPA-2**

Apparently, none of the officers on the scene knew what a "business carry" firearm license was.  After turning to the internet, the officers had even less clarity.  Even so, the officers continued watching and eventually saw plaintiff and two others leave the eatery and sit in the blue BMW for about half an hour.  After plaintiff began to drive away, the officers initiated a traffic stop.

As Officer Bessen approached him, plaintiff immediately notified Bessen of his firearms license and the existence of a firearm in the glove box.  Bessen replied, "I did not ask you that, step out of the vehicle."  Plaintiff, along with his family, complied.  Bessen recovered plaintiff's firearm from the glove box, along with plaintiff's Concealed Carry License.

Officer Bessen, probably confused by what a "business carry" license was, and even more confused that plaintiff's physical license didn't match what he saw in the database, arrested plaintiff, purportedly for violating N.Y. Penal Law ("NYPL") § 400.00 ("Licensing and other provisions relating to firearms.").  The next day, plaintiff was arraigned on various state and city firearms offenses.  A day later, Officer Astarita, from the police "Licensing Division," began investigating plaintiff's arrest.

Astarita notified plaintiff that, by law, he was required to surrender his other firearms, and his licenses would be temporarily suspended, pending the resolution of the investigation.  About three months after his arrest, all of the criminal charges were dismissed, and plaintiff notified Astarita about the dismissal.  About two weeks thereafter, Astarita closed the Licensing Division investigation and plaintiff was notified that his licenses would be "continued" (*i.e.*, the licenses would remain valid).

**SPA-3**

Plaintiff filed the instant suit not long after. According to plaintiff, Officer Bessen having arrested him constitutes a false arrest, and the suspension-surrender law as applied violated his Second Amendment rights.

**DISCUSSION**

Defendant seeks summary judgment on all of plaintiff's four causes of action: (1) discriminatory prosecution under 42 U.S.C. § 1981; (2) violation of plaintiff's Second Amendment rights under 42 U.S.C. § 1983; (3) false arrest and imprisonment under 42 U.S.C. § 1983; and (4) municipal liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). Because plaintiff "does not oppose dismissal of his Section 1981 claim," Count 1 is dismissed, and the Court considers only the disputed claims. Plaintiff's theory is that defendants falsely arrested him (Count 2), which triggered a suspension-surrender law that violated his Second Amendment rights (Count 3), all of which was executed pursuant to an unconstitutional municipal policy (Count 4).

Plaintiff does not challenge the suspension-surrender law as unconstitutional on its face. Rather, plaintiff claims that it was unconstitutional to apply the suspension-surrender law to him because he was a lawful gun owner who was falsely (as opposed to lawfully) arrested. So, if plaintiff's false arrest claim fails, his Second Amendment claim necessarily fails.

If plaintiff's false arrest and Second Amendment claims fail, the Monell claim must also fail because a municipality "cannot be liable under Monell [without] a violation of [plaintiff's] constitutional rights." Askins v. Doe, 727 F.3d 248, 253 (2d Cir. 2013); Fappiano v. City of N.Y., 640 F. App'x 115, 121 (2d Cir. 2016) ("[I]n the absence of an underlying constitutional violation by a [municipal] employee there is no municipal liability under Monell").

**SPA-4**

## I.  Summary Judgment Standard

Rule 56 provides that summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all facts "in the light most favorable to the nonmoving party." Scott v. Harris, 550 U.S. 372, 380 (2007). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for" plaintiff. See id. (plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts" (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986))); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment"). To survive summary judgment, plaintiff must now marshal "concrete evidence from which a reasonable juror could return a verdict in his favor." See id. at 256.

## II.  False Arrest

"Claims for false arrest brought under Section 1983 are 'substantially the same' as claims for false arrest under state law." Ashley v. City of N.Y., 992 F.3d 128, 136 (2d Cir. 2021) (quoting Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003)). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Jocks, 316 F.3d at 134-35 (quoting Broughton v. State, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93 (1975)).

Only the fourth element – whether the confinement was privileged – is disputed. According to defendants, the confinement was privileged because Officer Bessen had probable

cause to believe that plaintiff stored his firearm in the glove box instead of "an appropriate safe storage depository," in violation of NYPL § 265.45(2).  See Guan v. City of N.Y., 37 F.4th 797, 804 (2d Cir. 2022) ("An arrest is privileged if it is based on probable cause, for probable cause is a complete defense to a false arrest claim.").  Plaintiff counters that NYPL § 265.45(2) is irrelevant because he was arrested on suspicion of violating NYPL § 400.00.  In other words, plaintiff contends that defendants must establish that there existed probable cause to arrest plaintiff under NYPL § 400.00.

Plaintiff is wrong.  "Probable cause exists when 'the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'"  Kass v. City of N.Y., 864 F.3d 200, 206 (2d Cir. 2017) (quoting Marcavage v. City of N.Y., 689 F.3d 98, 109 (2d Cir. 2012)).  The Supreme Court has long "held that the probable cause inquiry is based on whether the arresting officer had objective probable cause to arrest for any offense, not whether the officer had probable cause to arrest for the specific offense invoked at the time of the arrest."  Guan, 37 F.4th at 805 (citing Devenpeck v. Alford, 543 U.S. 146 (2004)).  Thus, defendants may now invoke any statute, including NYPL § 265.45(2), to show that the officers had probable cause to arrest plaintiff.

Defendants maintain that Officer Bessen had probable cause to believe that plaintiff violated NYPL § 265.45(2) based on the tip they received from an informant, while plaintiff was in the eatery with his family.  According to the informant, when plaintiff initially returned to his car, he placed the firearm in the glove box.  A person violates NYPL § 265.45(2) by "leav[ing] a [firearm] out of [their] immediate possession or control inside a vehicle without . . . securely locking [it] in an appropriate safe storage depository out of sight from outside the vehicle."  "For

SPA-6

the purposes of [NYPL § 265.45(2)], a glove compartment or glove box shall not be considered an appropriate safe storage depository."  NYPL § 265.45(3).  Thus, if the tip was accurate, plaintiff had violated the "appropriate safe storage depository" requirement of NYPL § 265.45(2).[1]

The only question that remains is whether "the informant's tip was reliable enough to establish probable cause[.]"  United States v. McKenzie, 13 F.4th 223, 238 (2d Cir. 2021).  "It is enough, for purposes of assessing probable cause, that [corroboration] through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing a substantial basis for crediting the [informant's information]."  Illinois v. Gates, 462 U.S. 213, 245 (1983) (quotations omitted).  In other words, if enough of the "the informant's allegations [are] corroborated via the first-hand observations of law enforcement officers," McKenzie, 13 F.4th at 238, probable cause may exist to believe the information that the officers are unable to corroborate.

Here, the informant notified defendants that "a male Indian, whose approximate height was 5 feet 10 inches, wearing black pants, black shoes, a black and white shirt with a gold chain, and a pony tail hairstyle, was in possession of a firearm."  The informant further stated that after the "male attempted to enter an 'establishment' with a firearm . . . he walked over to where his car was parked, placed the gun inside the glove box, and then closed the car and returned to the 'establishment' no longer armed with the gun."  The informant described the car as "a blue BMW that was parked on a hydrant at the Northeast corner of Newport Street and Chester Street."

---

[1] Plaintiff says that he initially locked the gun in a statutorily compliant thumbprint safe under his rear seat.  Even if true, that is irrelevant to the question at issue in this case, which is whether the officers had probable cause to believe that plaintiff placed the firearm in the glove box, i.e., not in a statutorily compliant safe.

Upon the officers' arrival at that location, the officers observed a blue BMW parked near a fire hydrant. Eventually, the officers saw plaintiff – who is 5 feet 11 inches tall, and was wearing black pants, a black and white shirt, gold chain, and had hair long enough to pull into a pony tail – get into the blue BMW. In other words, the officers independently corroborated every piece of information that the informant gave except for the location of the firearm inside the vehicle. That is sufficient to establish probable cause to believe the uncorroborated information, *i.e.*, that plaintiff stored his firearm in his glove box, in violation of NYPL § 265.45(2).[2] The officers therefore had probable cause to arrest plaintiff.

Accordingly, the Court grants summary judgment on plaintiff's false arrest claim. And for the reasons above, because plaintiff's false arrest claim fails, his remaining claims necessarily fail, too.

### CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment.

**SO ORDERED.**

Dated:    Brooklyn, New York
          April 6, 2026

*Brian M. Cogan*
_____
U.S.D.J.

---

[2] The fact that the firearm was actually located in the glove box during the search is likewise irrelevant. "The police may not rely on information gained after-the-fact to show that probable cause existed at the time of arrest." Toure v. Port Auth. of N.Y. & N.J., No. 21-cv-1645, 2025 WL 3674392, at *25 (E.D.N.Y. Dec. 18, 2025) (quotations omitted).

**SPA-8**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
RAFFIQUE N. KHAN,

              Plaintiff,                           JUDGMENT
                                                   24-cv-2168 (BMC)

     v.

CITY OF NEW YORK, et al.,

              Defendants.
------------------------------------------------------------- X

        A Memorandum, Decision, and Order of the Honorable Brian M. Cogan, United States

District Judge, having been filed on April 6, 2026, granting defendants' motion for summary

judgment; it is

        ORDERED and ADJUDGED that defendants' motion for summary judgment is granted.

Dated: Brooklyn, NY                                     Brenna B. Mahoney
       April 7, 2026                                     Clerk of Court

                                                   By: */s/Jalitza Poveda*
                                                     Deputy Clerk

# SPA-9